UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2009-082 (WOB-JGW)

ANTHONY HOLT, ET AL.                                      PLAINTIFFS

VS.                        MEMORANDUM OPINION AND ORDER

CAMPBELL COUNTY, KENTUCKY,
ET AL.                                                    DEFENDANTS

        This is an action by former detainees at the Campbell
County Detention Center (CCDC) against the County and
Southern Health Partners (SHP) alleging cruel and unusual
punishment in violation of the 8th and 14th Amendments and
plaintiffs' civil rights under 42 U.S.C. § 1983.  Plaintiffs
also allege state law claims.

        This matter is currently before the Court on the
motions of the Campbell County defendants for partial
summary judgment as to plaintiffs Alma Jarman and Robin
Dunaway (Doc. 166), who are the co-administrators of the
Estate of Ernest Dunaway, and plaintiff Christina Dunaway
(Doc. 182), a daughter of Ernest Dunaway; and the motion of
Southern Health Partners for summary judgment as to the
claims of these three plaintiffs.  (Doc. 170).

        Having reviewed the parties' briefs, the Court
concludes that oral argument is unnecessary to the

resolution of these motions.  The Court therefore issues the following Memorandum Opinion and Order.

### *Factual and Procedural Background*

**A.   Facts Common to All Claims**

Since February 1, 2007, the CCDC has had a contract with SHP pursuant to which SHP provides "all professional medical, mental health, dental and related health care and administrative services" for CCDC inmates, including sick call, nursing care, regular and emergency physician care. (Doc. 132-1).  SHP, in turn, contracts with a physician and employs nurses to staff the CCDC.  These arrangements were in place at all times relevant to this action.

Plaintiffs filed this case on June 17, 2009, as a proposed class action.  (Doc. 1).  On June 1, 2010, plaintiffs filed a Second Amended Class Action Complaint, which is the operative complaint herein.  (Doc. 38).  Plaintiffs Alma Jarman and Robin Dunaway -- respectively, the mother and a daughter of Ernest Dunaway -- joined this lawsuit via the Second Amended Complaint.

Plaintiffs allege that they or their decedents were denied medical attention for their serious medical needs in violation of their 8th and 14th Amendment rights.  (Doc. 38 ¶¶ 331-32).  Plaintiffs also allege negligent or intentional infliction of emotional distress, negligence,

2

loss of consortium, and wrongful death.

On July 9, 2010, this Court denied plaintiffs' motion for class certification.  (Doc. 48).

Plaintiff Christina Dunaway, also a daughter of Ernest Dunaway, filed a separate lawsuit on March 24, 2011, Cov. Civ. Action No. 11-58, which this Court consolidated with the *Holt* action.  However, Christina is not an administrator of her father's Estate.  She alleges a claim under § 1983 and a claim for loss of consortium.

After extended discovery, the pending motions for summary judgment were filed and briefed.

### B.    Decedent Ernest Dunaway

Ernest Dunaway was incarcerated at the Carroll County Jail in late 2008 on drug trafficking charges.  Before completing his sentence, however, he was granted a medical furlough and was admitted to St. Luke Hospital in Ft. Thomas, Kentucky for treatment for hepatitis C and cirrhosis of the liver.  (Doc. 166 Exh. 4).  Dunaway was released from the hospital on January 15, 2009, with instructions to follow up with his physician, and he returned to the Carroll County Jail.

On February 5, 2009, Carroll County transferred Dunaway to the CCDC.  At booking, Dunaway told the deputy that he had "multiple stomach problems" and took "several

3

medications," but he did not state that he had hepatitis C or cirrhosis. (Doc. 166 Exh. 8).

The next day, however, the Carroll County Jail transferred Dunaway's medical records to the CCDC, where they were reviewed by SHP Nurse Autenrieb, who started Dunaway on his medications: Tramadol, a multivitamin, Neomycin, Sprironolactone, Omeprazole, Thiamine, Furosemide, and lactulose. (Doc. 166 Exh. 10 at 1).

On February 16, 2009, Dunaway was taken to medical for a general history and physical examination, but he refused to be examined. (Doc. 166 Exh. 10 at 1; Doc. 170 Exh. 3). The nurse's notes reflect that Dunaway was screaming and hallucinating during this encounter. (Doc. 166 Exh. 10 at 1). Dunaway was therefore moved to a medical cell for observation. When he was later observed to be non-verbal with moderate tremors, the SHP doctor ordered that he be taken by EMT to the emergency room at St. Luke Hospital. (Doc. 166 Exh. 10 at 2).

St. Luke discharged Dunaway two days later, on February 18, 2009, with diagnoses of delirium from liver disease and hepatitis; drug abuse history; subclinical sinus infection; and lactulose pneumonia, stable. (Doc. 166 Exh. 14) The hospital also ordered two new medications, Norvasc and Keflex, which Dunaway began

4

receiving once back at the CCDC.  (Doc. 166 Exh. 10 at 2).
Per the doctor's order, Dunaway was also placed on a low
sodium, low protein diet.  (*Id.*).

On February 19, 2009, Dunaway submitted a sick call
slip stating that he needed to see medical as soon as
possible, but the slip did not state what his medical
problem was.  (Doc. 170 Exh. 5).

On February 25, 2009, Dunaway submitted a grievance to
CCDC Captain James Young stating that he was not getting
the correct medications at the correct times.  (Doc. 166
Exh. 15).  Young consulted with medical staff the same day,
who reported that Dunaway's medications had been adjusted
because he was on several different diuretics and blood
pressure medication, and also that his Tylenol had been
discontinued because he had been prescribed Tramadol for
pain.  (Doc. 166 Exh. 16 at 2).  Young then responded to
Dunaway's grievance, explaining that medical had "re-
evaluated your situation and your medications are correct."
(*Id.* at 1).

From late February through late March, Dunaway
submitted sick call slips regarding kidney and liver pain;
urinary tract infections; a request for new glasses and ear
cleaning; nausea caused by the jail food; a chemical burn
from sitting on a toilet when it still had cleaning product

on it; and vomiting.  (Doc. 170 Exhs. 6-15).  Medical staff examined Dunaway multiple times; obtained urine and blood pressure tests; prescribed a burn cream for the chemical burn; and prescribed Phenargan for nausea and Ibuprofen for a low-grade fever.  (*Id.*).

On March 22, 2009, Dunaway filled out a sick call slip complaining of high fever, chills, nausea, and infection/swelling in his right leg.  (Doc. 166 Exh. 18).  That same day, medical staff administered an antibiotic and monitored Dunaway.  Doc. 166 Exh. 10 at 3).  When the swelling and redness had not improved by the next day, the SHP doctor ordered that Dunaway be taken back to the hospital.  (*Id.* at 4; Exh. 18).

Dunaway was admitted to St. Luke, where he was diagnosed with cellulitis of the lower right leg and administered intravenous antibiotics.  (Doc. 166 Exh. 19).  He remained in the hospital from March 23 until April 1, 2009, when he was discharged back to the CCDC.  His discharge notes state: "His other medical problems of cirrhosis, edema, anxiety, depression were otherwise stable."  (*Id.*).  Upon his return to the CCDC, Dunaway was given his prescribed outpatient antibiotics.  (Doc. 166 Exh. 10 at 4).

On April 3, 2009, SHP nurses examined Dunaway and

noted that he had no complaints of pain.  (*Id.*).

Two days later, on April 5, Dunaway completed a sick call slip complaining of pain in his legs, problems sleeping, heat in his feet, and migraines. (Doc. 166 Exh. 20)  A nurse saw him on April 8 and referred him to the jail doctor.  (Doc. 166 Exh. 21).  Dr. Waldridge saw him the next day, noted that his cellulitis was resolved, and ordered a ten-day course of Ibuprofen to address his pain. (Doc. 166 Exh. 10 at 5).

Several days later, on April 13, 2009, Dunaway filled out another sick call slip complaining of pain and hot/cold feelings in his feet.  (Doc. 166 Exh. 22 at 1).  He was seen two days later by SHP Nurse Tucker, who gave permission for him to have a blanket to cover up with and placed him on the doctor's list to be evaluated.  (Doc. 166 Exh. 23).

On April 21, 2009, Dunaway filed another sick call slip stating he had pain and burning in his feet and legs. (Doc. 166 Exh. 22 at 2).   The next day, he was seen for a follow-up appointment with Dr. Cohen[1], who noted that Dunaway's cellulitis was resolved and released him from his practice.  (Doc. 170 Exh. 22).

---

[1] Dr. Cohen was the infectious disease physician that had treated Dunaway at St. Luke during his admission for cellulitis.  (Doc. 166 Exh. 19).

On April 24, 2009, medical staff were notified that Dunaway was sleep walking and incontinent.  (Doc. 166 Exh. 10 at 6).  SHP Nurse Autenrieb examined Dunaway and noted that his blood pressure and heart rate were slightly elevated.  She gave him his morning medications and drew blood to test his liver function and electrolyte levels. (*Id.*).  Nurse Autenrieb continued to monitor Dunaway, and when he did not improve and his labwork came back abnormal, he was sent back to St. Luke.  (Doc. 170 Exh. 23).

St. Luke noted of Dunaway's medical history: "He has a history of longstanding hepatic encephalopathy secondary to alcohol, hepatitis C and a history of dementia secondary to polysubstance abuse, longstanding." (*Id.* at 1).  The hospital treated Dunaway and discharged him the following day, April 25, 2009.

That same day, SHP Nurse Tucker examined Dunaway and noted that he was nonverbal and in a "catatonic" state, so she made a call to Dr. Waldridge to advise him of the situation.  (Doc. 166 Exh. 10 at 7).

In the meantime, Dunaway encountered Deputy Cummins and told him that he (Dunaway) was supposed to have fruit with every meal and get medicine every two hours, that he was "not going to make it to the end of the day," and that he would be returned to the hospital that night.  (Doc. 166

8

Exh. 27).  Deputy Cummins reported this encounter to Nurse Pangallo, who stated that, while Dunaway was ill, there were no orders from St. Luke matching his statements. (*Id.*).

Around 5:00 p.m., Nurse Pangallo again examined Dunaway and found him to be alert and verbal and able to walk without any problem.  (Doc. 166 Exh. 10 at 8).  Upon examination, she found him to be oriented to person, place, time, and situation.  (*Id.*).  Nonetheless, Dunaway was moved from the dorm to Cell 137 where he could be monitored by medical staff.  (*Id.*).

Medical staff checked Dunaway's blood sugar levels regularly over the next week, and they attempted to check his blood pressure but he refused.  (Doc. 166 Exh. 24).

On April 27, 2009, Dunaway submitted a sick call slip complaining of bad headaches.  (Doc. 166 Exh. 29).  Two days later, Dunaway filed a grievance complaining that he had not been seen by medical for his headaches.  (Doc. 166 Exh. 31).  Dunaway was then seen by medical staff on May 3 and given Ibuprofen for his headaches.  (Doc. 166 Exh. 29).

The next day, May 4, Dunaway submitted another sick call slip complaining of severe headaches and "side pain." (Doc. 166 Exh. 29 at 2).

On May 5, Captain Young responded to Dunaway's

9

grievance, stating that medical had been consulted and stated that Dunaway should fill out sick call slips to request medicine for his headaches.  (Doc. 166 Exh. 32).

On May 6, at approximately 10:30 a.m., Dunaway refused to get out his bunk, stating that he could not walk, although the deputies reported that he had been up and walking around earlier in the day.  (Doc. 166 Exh. 10 at 9).  Medical staff checked on Dunaway just over an hour later and observed that he was walking around his cell without problem.  (*Id.*).

On May 7, Dunaway was seen by a SHP nurse and prescribed Ibuprofen, 800 mg, for his headaches.  (Doc. 166 Exh. 29 at 4).

On May 8, around 10:40 a.m., SHP Nurse Tucker attempted to give Dunaway his medications, but Dunaway refused to get up.  (Doc. 166 Exh. 10 at 9).  Tucker encouraged him to get up to take his medicines, but he would not.  The other two inmates in the cell later reported to a deputy that Tucker then said "Fuck it!" and slammed the door and left.  (Doc. 184-6).  Tucker noted that Dunaway would thereafter be closely monitored.  (Doc. 166 Exh. 10 at 9).  Tucker checked on him two hours later and observed him walking around his cell without difficulty.  (*Id.*).

Around 4:00 p.m., a deputy called Tucker to Dunaway's cell, where she found him lying on the floor on his side. (Doc. 166 Exh. 10 at 10). Tucker called Deputy Curtis Music to come assist her. (Doc. 184-7). Dunaway stated that he had urinated on himself. Deputy Music later reported that Dunaway "appeared to be in distress" because of "heavily labored respirations and forced vocalizations." (*Id.*). Music also reported that Dunaway has stated that "he thought that he had suffered from a stroke earlier in the day." (*Id.*). Tucker, however, observed that Dunaway was otherwise alert, and she and Deputy Curtis Music assisted Dunaway back to his bunk. (*Id.;* Doc. 184-7). Tucker elevated Dunaway's feet with a rolled up blanket and noted that she would continue to monitor him.

At 4:48 p.m., Deputy Larkin conducted a regular headcount and observed Dunaway to be using the toilet. (Doc. 170 Exh. 26). Around 5:10 p.m., Deputy Larkin served dinners in the cell and observed Dunaway to be lying on his bunk. Another inmate stated that he would hand the tray to Dunaway. (*Id.*).

Just before 6:00 p.m., Deputy Larkin and Deputy Music began collecting the dinner trays. When they entered the medical cell, they observed Dunaway to be lying in an "awkward" way and that his hand was purple, and when Deputy

11

Larkin checked for a pulse, he found none.  (*Id.*).

Dunaway's face was cold and his lips had turned blue.  Two

other inmates in the cell told Deputy Larkin that they had

been talking with Dunaway about fifteen minutes before the

deputies entered.  (*Id.*).  The deputies summoned medical

staff, who called 911.  Dunaway was pronounced dead when

the EMTs arrived.

An autopsy stated the cause of Dunaway's death was a

cerebral hemorrhage.  (Doc. 166 Exh. 34).

*Analysis*

**A.   Legal Standards**

Section 1983 prohibits any "person who, under color of

any statute, ordinance, regulation, custom, or usage, of

any State" from depriving any U.S. citizen "of any rights,

privileges, or immunities secured by the constitution and

laws."  Plaintiff argues that his Eighth Amendment rights

to be free from cruel and unusual punishment were violated.

"As applied to prisoners, this constitutional

guarantee encompasses a right to medical care for serious

medical needs."  *Perez v. Oakland County*, 466 F.3d 416, 423

(6th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97,

103-04 (1976)).  However, because the Eighth Amendment

prohibits mistreatment only if it is tantamount to

"punishment," courts have imposed liability upon prison

12

officials only where they are "so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain." *Perez*, 466 F.3d at 423 (internal quotations and citation omitted).

"Negligence or medical malpractice alone cannot sustain an Eighth Amendment claim, absent a showing of deliberate indifference." *Id.* (citing *Estelle*, 429 U.S. at 105-06).

"Deliberate indifference" has both an objective and a subjective component. *Id.* (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)). With respect to medical needs, the need "must be objectively, 'sufficiently serious.'" *Id.* at 423-24 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

"In considering the subjective component, this circuit has emphasized that a plaintiff must produce evidence showing that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* at 424 (internal quotations and citation omitted). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."

13

*Farmer v. Brennan*, 511 U.S. 825, 838 (1994).  *See also id.*
at 842 (official must act or fail to act "despite his
knowledge of a substantial risk of serious harm").

The subjective component "prevents medical-malpractice
claims from being transformed into constitutional claims."
*Quigley v. Thai*, 707 F.3d 675, 681 (6th Cir. 2013)
(citation omitted).

> **B.   Qualified Immunity**

Assuming a plaintiff raises a triable issue as to
whether a constitutional violation occurred, a public
official sued in his or her individual capacity may still
be shielded from suit under the doctrine of qualified
immunity.  All defendants here assert this defense.

"The doctrine of qualified immunity protects
government officials 'from liability for civil damages
insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known.'" *Pearson v. Callahan*,
129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*,
457 U.S. 800, 818 (1982)).  "The protection of qualified
immunity applies regardless of whether the government
official's error is 'a mistake of law, a mistake of fact,
or a mistake based on mixed questions of law and fact.'"
*Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)

14

(Kennedy, J., dissenting)).

C. **Application to Dunaway's Claims**

1. **Objectively Serious Medical Condition**

The Court assumes for purposes of summary judgment that Dunaway suffered from one or more objectively serious health conditions, primarily advanced cirrhosis of the liver.

2. **Deliberate Indifference**

a. **CCDC Defendants**

In their response to the CCDC's motion for summary judgment, plaintiffs state:

> Plaintiffs concede that discovery has revealed no documentation to connect Mr. Dunaway to any of the individual named Defendants and none of the individual Defendants remember Mr. Dunaway. However, Defendant Campbell County is not entitled to summary judgment because there are genuine issues of material fact . . .

(Doc. 184 at 1).

Further, plaintiffs state, "[T]here is no evidence of subjective knowledge of Mr. Dunaway's serious medical problems," (Doc. 184 at 6), and, "Due to the fact that Mr. Dunaway has passed and there is no documented evidence of any contact with Buckler, Fickensher, Daley, or Fletcher, the Plaintiffs concede that they cannot uphold their claims against these Defendants as individuals." (Doc. 184 at 14).

15

It is abundantly clear, therefore, that absent evidence that these individual defendants knew of Dunaway's medical needs, they cannot be held to be deliberately indifferent as a matter of law.  *Loggins v. Franklin County, Ohio*, 218 F. App'x 466, 474 (6th Cir. 2007).[2]

Despite the above concessions that none of the individual CCDC defendants violated Dunaway's constitutional rights, plaintiffs argue that Campbell County itself may still be liable based on a "clear pattern of failure to give medical treatment to inmates" at the CCDC.  (Doc. 184 at 14).  This argument is simply contrary to the law.

The Sixth Circuit, applying Supreme Court precedent, has clearly held that a "municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers."  *Blackmore v. Kalamazoo* County, 390 F.3d 890, 900 (6th Cir. 2004) (citation omitted).  *See also Bowman v. Corrections Corp. of Am.*, 350 F.3d 537, 545-46 (6th Cir. 2003) (same); *Modd v. County of Ottawa*, No. 1:10-cv-337, 2012 WL 5398797, at *20 (W.D. Mich. Aug. 24, 2012) ("Relieving plaintiffs of the obligation to show a

---

[2] The Court notes that Deputy Music, who did have contact with Dunaway the day that he died, was named in Christina Dunaway's lawsuit, but it appears he was never served. Covington Case. No. 11-cv-58.

culpable state of mind by any human being would certainly change the face of section 1983 litigation in this circuit. Unfortunately for plaintiff, such a result contravenes settled authority, which requires a showing *both* of individual indifference *and* that the municipality's policies were the motivating force behind that violation.") (citation omitted); *Alcorn v. Scott County Detention Ctr.*, Civil Action No. 09-232-JBC, 2011 WL 2145287, at *10 (E.D. Ky. May 31, 2011) (absolving county of liability where individual officers did not violate detainee's constitutional rights, even where there was evidence of unconstitutional policy or custom).[3]

For these reasons, all the CCDC defendants are entitled to summary judgment.[4]

---

[3] Plaintiffs also have adduced no admissible evidence of a clear and persistent pattern of deliberate indifference to inmate medical needs.  This Court has already held that the same affidavits submitted by plaintiffs here regarding allegedly poor care at the CCDC are: (1) inadmissible for a variety of reasons, and (2) even if admissible, inadequate as a matter of law to support a municipal liability claim against Campbell County.  *Fryman v. Campbell County*, Covington Civil Action No. 09-114-WOB-JGW, Docs. 25, 30.

[4] The Court thus need not reach the issue of qualified immunity, although the individual defendants would obviously be entitled to that defense given the absence of any constitutional violation.

17

### b.    SHP Defendants

First, plaintiffs have conceded that they have no claim against SHP defendants Steve Mullins and Josh Ernest. (Doc. 187 at 1).  They also have made no argument specific to defendants Waldridge, Dawes, Pangallo, or Evans in opposition to SHP's motion, and summary judgment on the § 1983 claims against those individuals is thus appropriate.

Indeed, reviewing the record in plaintiffs' favor, no reasonable jury could conclude that these individuals were deliberately indifferent to Dunaway's serious medical needs from the time he was admitted to the CCDC on February 5, 2009 until his death approximately three months later on May 8, 2009.  Although Dunaway suffered from grave medical problems -- advanced cirrhosis of the liver with associated dementia and a bout of cellulitis in his leg -- he was consistently evaluated, treated with medications as prescribed by his physicians, and sent several times to St. Luke Hospital for treatment.  There are thus no triable issues as to deliberate indifference by these defendants.

This leaves SHP defendant Nurse Danielle Tucker.  It was Nurse Tucker who, along with a deputy, found Dunaway lying on the floor of the cell around 4:00 p.m. on May 8, 2009, two hours before his death.  Construing the record in plaintiffs' favor, Dunaway told Tucker that he had tried to

18

use the bathroom but he had urinated on himself and that he thought he had had a stroke earlier that day.  However, Tucker noted in the progress notes that Dunaway appeared to be oriented to person, place, and time, and that he was assisted back to his bunk without difficulty.  (Doc. 166 Exh. 10 at 10).  She also noted that she would continue to monitor him.  (*Id.*).

It is important to note that, although other inmates later stated that Dunaway had been asking for help throughout the day, there is no evidence that Tucker knew of that fact.  Indeed, there does not appear to be a transcript of any deposition of Tucker in the record, and the parties cite to none.  Tucker's subjective knowledge of Dunaway's situation can thus only be inferred from her documentation and other evidence concerning their interactions.

In any event, while it may have been negligent or even grossly negligent for Tucker to have placed Dunaway back in his bunk rather than taking him for further evaluation or treatment, such a decision cannot be said to amount to deliberate indifference.  This is particularly true where Tucker ordered that Dunaway be closely monitored, and the guards indeed observed him up and using the toilet at least once during the next two hours.  The other two inmates in

19

the cell, in fact, reported that they had been talking with Dunaway just fifteen minutes before he was found dead.

There is thus no evidence that Tucker's failure to take further action at the 4:00 p.m. encounter caused or contributed to Dunaway's death, however tragic. Plaintiff's expert witness, Dr. Paris, does not mention Nurse Tucker or the 4:00 p.m. encounter at all in his report, and he expressly declined to opine as to causation. (Doc. 166 Exh. 35 at 3).  Indeed, Dr. Paris stated that Dunaway died with "terminal cirrhosis" and a "difficult to prove picture of cerebral infarction and mitral valve vegetations, both pointing to a septic process that could not be proven at autopsy *and was not evident during life*." (*Id.*) (emphasis added).  He further stated:  "Altogether these findings point to a terminal cirrhotic alcoholic who would not have survived much longer as a free person. Incarceration, by separating him from alcohol and drugs, likely prolonged his life."  (*Id.*).

There is thus no evidence – particularly given the absence of any testimony from Tucker herself -- from which one could reasonably infer that Tucker perceived a serious risk to Dunaway's health during the 4:00 p.m. encounter and that she then deliberately disregarded that risk.

Under the above authority, absent a showing of an

20

underlying constitutional violation, plaintiffs can state no claim against SHP as an entity. *See Bowman v. Corrections Corp. of Am.*, 350 F.3d 537, 546-47 (6th Cir. 2003) (holding no § 1983 liability against medical contractor to jail where no individual medical employee violated detainee's constitutional rights).

   **D.   <u>Section 1983 Claim of Christina Dunaway</u>**

   In addition to the flaws in plaintiffs' § 1983 claims identified above, plaintiff Christina Dunaway's § 1983 claim fails for the independent reason that she does not represent her father's estate.

   In the Sixth Circuit, a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort. *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000) (citations omitted). "Accordingly, only the purported victim, or his estate's representative(s), may prosecute a section 1983 claim; conversely, no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members." *Id.*

   Therefore, Christina cannot maintain a § 1983 claim on her own behalf.

21

E.   <u>**State Law Claims**</u>

As has been the Court's practice in these cases, it will decline to exercise its supplemental jurisdiction over all state law claims asserted in this matter.

Therefore, having reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that the motions of the Campbell County defendants for partial summary judgment as to plaintiffs Alma Jarman, Robin Dunaway, and Christina Dunaway (Docs. 166, 182) be, and are hereby, **GRANTED;** (2) the motion of Southern Health Partners for summary judgment as to these three plaintiffs (Doc. 170) be, and is hereby, **GRANTED AS TO PLAINTIFFS' FEDERAL CLAIMS**; and (3) Plaintiffs' state law claims be, and are hereby, **DISMISSED WITHOUT PREJUDICE.**

This 25th day of September, 2013.



Signed By:

_William O. Bertelsman_  WOB

United States District Judge